UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Criminal No. 21-CR-00258-TFH |
| | : | |
| TROY SARGENT, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

### I.    Introduction

Troy Sargent stands prepared to be sentenced by this Court for the offenses he committed on the grounds of the United States Capitol on January 6, 2021. He has already accepted responsibility for his conduct in important ways: expressing regret to the officers who interviewed him upon arrest, Government's Sentencing Memorandum at 17; pleading guilty; explicitly acknowledging the harm he caused, PSR ¶ 33; and making clear changes in his behavior, as described in letters from his family. Exhibit A. Having turned himself in to custody as ordered by this Court, ECF # 63, Mr. Sargent has now undergone a difficult journey to be returned to the District of Columbia for the first time since the offense. He has been transported in custody from western Massachusetts to Rhode Island, then to Oklahoma, and now to Virginia. Troy Sargent clearly understands the gravity of his conduct and is ready to accept the consequences.

This Court must now determine those consequences based on the

specific and particular facts of this case. That determination must begin with the correct application of the sentencing guidelines. As discussed below, the advisory guideline range should be determined under USSG § 2A2.4, Obstructing or Impeding Officers. Under that guideline, Mr. Sargent's total offense level after a reduction for acceptance of responsibility is 11. The advisory range for Offense Level 11 in Criminal History Category I is 8-14 months. Under all the sentencing factors of 18 U.S.C. § 3553(a), a slight downward variance to a sentence of six months incarceration and two years of supervised release is one that is "sufficient, but not greater than necessary" to accomplish the purposes of sentencing.

Even should this Court adopt the government's guidelines calculation, which would result in an advisory range of 24-30 months, this case presents unique factors that take it outside the heartland of the aggravated assault guideline and call for a significant downward variance. The Supreme Court has recognized that it "has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007), quoting *Koon v. United States*, 518 U.S. 81, 113 (1996). Strong mitigating factors are present for Troy Sargent, such that in this particular case with this particular defendant, a sentence of six months incarceration and two years of supervised release is one that is sufficient but not greater than necessary.

II.     **The correct guideline is Obstructing or Impeding Officers because Troy Sargent did not commit an aggravated assault.**

A. The application of the aggravated assault guideline to assaults committed with the intent to commit another felony contradicts the assault statute and thus should not be accorded any weight in determining which guideline to apply.

The guidelines dispute in this case is whether to apply the Aggravated Assault guideline at § 2A2.2 or the Obstructing or Impeding Officers guideline at § 2A2.4. In the presentence report the probation department applied the aggravated assault guideline to both Count One, Civil Disorder, and Count Two, Assaulting, Resisting or Impeding Certain Officers. PSR ¶¶ 41, 42, 48. The defense submitted an objection but the probation department has maintained its position. PSR p.38.

Count Two, Assaulting, Resisting or Impeding Certain Officers, is indexed to both guidelines. Count One, Civil Disorder, is not indexed to any guideline. PSR ¶ 41. In the absence of an expressly promulgated guideline, § 2X5.1 directs the Court to apply the most analogous guideline.

The only argument for applying the aggravated assault guideline to either civil disorder or assaulting an officer comes not from a guideline directly, but from the definition of "aggravated assault" in the commentary to §2A2.2. That the definition is within the commentary rather than the guideline itself is critical because commentary is not accorded the full force of the guideline, but rather should be treated as "an agency's interpretation of its own legislative rule." *Stinson v. United States*, 508 U.S. 36, 44 (1993). For many years agencies

were routinely granted deference in their interpretations of their own rules, but more recently the Supreme Court made it clear that there are important limits to that deference. *See generally Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-2418 (2019).

To be granted deference (referred to as *Auer* deference in reference to *Auer v. Robbins*, 519 U.S. 452 (1997)), an interpretation must be of a regulation that is genuinely ambiguous. *Kisor* at 2415. Genuine ambiguity cannot be determined based solely on the plain language of the regulation. Instead, courts must exhaust all the "traditional tools" of construction, including considering the text, structure, history and purpose of the regulation. *Kisor* at 2415 (citations omitted).

The Sentencing Guidelines have separate statutes for Aggravated Assault, § 2A2.2, Assault, § 2A2.3, and Obstructing or Impeding Officers, § 2A2.4. The statute for assaulting officers, 18 U.S.C. § 111, itself includes distinctions between three degrees of assault. For simple assault, the maximum punishment is not more than one year. For offenses that involve physical contact or the intent to commit another felony, the maximum punishment increases to eight years. Both of those circumstances are found in the same subsection as simple assault. 18 U.S.C. § 111(a). However, Congress wrote a separate subsection explicitly titled "Enhanced penalty" which applies to offenses involving a dangerous weapon or bodily injury and which increases the maximum to 20 years. 18 U.S.C. § 111(b).

Congress thus made a clear distinction in both the structure and

punishment of the statute. The only offenses that qualify for the explicit "enhanced penalty" of up to 20 years in prison are those that involve a dangerous weapon or bodily injury. While physical contact and the intent to commit another felony make a defendant subject to a greater sentence than simple assault, those circumstances fall closer, both in penalty and text, to simple assault than to offenses involving a dangerous weapon or bodily injury.

The distinctions that Congress enacted provide important context when determining the weight that should be afforded to the definitions of "aggravated assault" within the commentary to § 2A2.2. The commentary lists four categories of aggravated assault. Three of them are directly tied to the distinction Congress created within the statute itself- use of a dangerous weapon, bodily injury, and strangulation, which by its nature carries a serious risk of bodily injury. USSG § 2A2.2, Application Note 1. The fourth category, intent to commit another felony, is an outlier because it is unrelated to bodily injury or the risk of it. The Sentencing Commission simply elevated intent to commit another felony into the next more serious category despite the distinctions made by Congress within the statute itself. The Sentencing Commission subjected the intent to commit another felony to "aggravated assault" even though Congress did not subject it to the explicit "enhanced penalty" within the statute. The other circumstance that would subject a defendant to an eight-year maximum rather than one year for simple assault is physical contact. Notably, the Sentencing Commission did not include physical contact in its definition of "aggravated assault." There is simply no justification

for treating the intent to commit another felony differently than physical contact in clear contravention of the distinctions created by Congress in the statute.

For these reasons, §2A2.2 is not genuinely ambiguous and thus no deference should be given to the commentary that claims that the intent to commit another felony constitutes an aggravated assault. The definition of aggravated assault can be determined directly through the traditional tools of construction by examining the statute directly.

However, even if the Court determines that § 2A2.2 is genuinely ambiguous, an agency's interpretation must still be "reasonable" for it to control. *Kisor* at 2415 (citation omitted). In *Kisor*, the Supreme Court was clear: "And let there be no mistake: That is a requirement an agency can fail." *Kisor* at 2416. In this case, the Sentencing Commission failed the reasonableness test by making assaults with the intent to commit another felony equivalent to assaults that result in or risk bodily injury. This is an unreasonable interpretation in light of the statute and as a factual matter. An intent to commit another felony, by itself, simply does not make an assault equally serious as one that creates a risk of bodily injury.

The Third Circuit very recently applied the guidance of *Kisor* directly to the commentary to a sentencing guideline and determined that an explicit definition within the commentary should not be afforded any weight because it is not reasonable. In *United States v. Banks*, the Third Circuit determined that the Sentencing Commission's definition of "loss" within the commentary to §

6

2B1.1 to include intended loss should be accorded no weight. *United States v. Banks*, 2022 U.S. App. LEXIS 33021, 12-17 (3rd Circuit, November 30, 2022). In the commentary to the fraud guideline, the Sentencing Commission states that loss is the greater of actual or intended loss. USSG § 2B1.1, App. Note 3(A). However, the Third Circuit determined that despite this clear guidance, the inclusion of intended loss went beyond the ordinary meaning of "loss" within the guideline itself. *Banks* at 16-17. Because the expanded definition was unreasonable, it cannot be accorded any weight. *Banks* at 17.

The result should be the same in the present case. This Court can determine the meaning of aggravated assault within the actual guideline by consulting the distinctions within the statute itself. Those distinctions clearly make use of a dangerous weapon and risk of bodily injury aggravated in a way that the intent to commit another felony is not. The guideline itself is thus not genuinely ambiguous. But even if the Court determines that it is, the Sentencing Commission's inclusion of intent to commit another felony within the definition of aggravated assault is not reasonable and thus should not be accorded any weight.

B. The government has not proven that Mr. Sargent intended to commit another felony at the moment he committed the assault on an officer because the same exact conduct underlies both offenses.

Even if this Court determines that the intent to commit another felony can qualify an assault as aggravated in some circumstances, the enhanced guideline cannot be applied in this case because the exact same actions

constitute both the assault and the "other felony" of the civil disorder. For an offense to be properly be considered more serious, there must logically be evidence that shows that the defendant intended some other crime. Here, Mr. Sargent's actions of two open-handed swings at an officer thirty seconds apart are the factual basis for both Count One, Civil Disorder, and Count Two, Assaulting, Resisting or Impeding Certain Officers. PSR ¶¶ 27, 28.

The government bears the burden of proving sentencing enhancements by a preponderance of the evidence. See *United States v. Price*, 409 F.3d 436, 444 (D.C. Cir. 2005). The evidence as admitted during the change of plea, and as contained in the presentence report, does not show by a preponderance that Mr. Sargent intended to commit another felony when he committed the assault. Importantly, although the Superseding Indictment charged Mr. Sargent with felony assault under the theories of both physical contact and intent to commit another felony, ECF # 32, at the change of plea the government only proceeded on the theory of physical contact. Thus, Mr. Sargent did not admit that he committed the assault with the intent to commit another felony. ECF # 57, Statement of Offense, ¶ 13.

The presentence report correctly describes the facts supporting the assault as two open-handed swings at on officer, 30 seconds apart. PSR ¶¶ 27, 28. One of the swings made glancing contact with the officer's visor and caused neither damage nor injury. Government Exhibit 7.[1] The other swing made no contact

---

[1] Government Exhibit 7 is a seven-second video of Mr. Sargent's first open-handed swing. At full speed it is difficult to make out any contact at all. By toggling the pause button on and off quickly, it is possible to proceed frame by

with the officer whatsoever. PSR ¶ 27; Government Exhibit 8. Each swing lasted less than one second.

For the aggravated assault guideline to apply, the government must prove by a preponderance that Mr. Sargent intended to also commit Civil Disorder at precise moment of the swings. The government would therefore have to prove that Mr. Sargent was not acting with any other intent. In fact, the evidence reveals Mr. Sargent's actual intent in committing the assault. Mr. Sargent made a Facebook post shortly after the incident that he approached the line of officers in reaction to flash grenades being thrown into the crowd. PSR ¶ 29. Mr. Sargent's reaction was completely unjustified and he has fully admitted his crimes. His description of his conduct was also clearly exaggerated. However, it is clear that the assault was committed out of unjustified anger, not an intent to commit Civil Disorder. This lack of *intent* to commit Civil Disorder is also shown by Mr. Sargent's decision to leave the Capitol grounds without making any attempt to enter the Capitol building itself. Government Sentencing Memorandum at 25. Mr. Sargent's actions are thus distinct from those who participated throughout the events of January 6, 2021 and entered the Capitol building, thereby demonstrating an intent to engage in Civil Disorder.

Indeed, the crime of Civil Disorder itself does not require that the defendant *intend* to commit a civil disorder. A court in this district recently found that

---

frame. At the four second mark, it becomes clear that Mr. Sargent's open hand is visible through the officer's visor from body camera footage obtained from the officer behind the one seen in the video. The video makes clear that the contact is glancing by a finger.

commission of Civil Disorder under 18 U.S.C. § 231(a)(3) requires the government to prove that the defendant "committed, or attempted to commit, an act with the intent to obstruct, impede, or interfere with law enforcement officers who were lawfully carrying out their official duties incident to a civil disorder." *United States v. Reffitt*, 2022 U.S. Dist. LEXIS 81138 at 16 (May 4, 2022) (Friedrich, J.). See also ECF # 57, Statement of Offense, ¶ 12. The crux of the offense is thus interference with an officer *during* a civil disorder, not *intent to commit* a civil disorder. This is exactly what Mr. Sargent did- he assaulted an officer during a civil disorder, thus satisfying both statutes. However, he did not swing his open hand with a larger purpose beyond what he described in his own words and what he showed by his action of leaving the Capitol grounds shortly after the incident.

Cases that analyze whether a defendant had an intent to commit another felony usually involve guidelines other than § 2A2.2 but are instructive in that the intent to commit a separate, distinct offense is clear. In one recent case in this district a similar enhancement for intent to commit another felony applied in the context of possession of a firearm under § 2K2.1 because it was clear that the defendant had an intent to use the firearm in addition to possessing it. *United States v. Calloway*, 2021 U.S. Dist. LEXIS 140946  (D-D.C. 2021) (Leon, J.).  Similarly, a case in the 5th Circuit applied the enhancement to a defendant who pled guilty to assaulting a postal worker but whose conduct clearly demonstrated an intent to also commit the separate felony of sexual assault. *United States v. Wilson*, 858 Fed. Appx. 747, 749-750 (5th Cir. 2021) (per

curiam unpublished).  The present case is different because there is no evidence of an intent to commit a separate, distinct offense. The same momentary conduct underlies both Civil Disorder and Assault on an Officer. The Aggravated Assault guideline is clearly intended to apply when the defendant has a larger, felonious purpose, which is not borne out by the evidence here.

Judge Berman Jackson recently determined that the aggravated assault guideline did not apply in similar circumstances in another January 6th case. In *United States v. Hamner*, the defendant pled guilty to one count of Civil Disorder under 18 U.S.C. § 231 while the other counts remained untried. *United States v. Thomas Hamner*, 21-cr-00689-ABJ, Minute Entry June 16, 2022. At sentencing, the government and probation took the position that the aggravated assault guideline should apply because the civil disorder was committed with the intent to commit an assault on an officer based on the same underlying conduct. *Hamner*, supra, ECF # 28, Government's Sentencing Memorandum, at 21.

Judge Berman Jackson rejected that argument. Her reasoning and explanation apply directly to this case.

> But there's no reason to believe that this is meant to be based on just the hypertechnical alignment of elements. Because when the guideline, at least in the gun context, tells you, well, you'd use the guideline for that offense instead of the firearms offense, it seems clear that it means something other than another gun possession offense. And it seems that the government's approach strips the provision of any meaning.

> It strikes me that if the Commission is asking: Did you commit the assault with the intent to commit some other offense? It didn't mean with the intent to commit that exact same assault, just charged differently. They

could have easily defined "another offense" as any offense with any different elements that's a different offense, but they didn't.

Its also important to note that the cross reference says that you go to aggravated assault if the assault on the police officer involved the intent to commit another felony, not the same intent needed to satisfy the elements of another felony, not that it was committed during the commission of another felony. This suggests that the guideline is meant to cover just the situation in the cases that you cited, where the assault on the police officer is intended to facilitate or further or advance or succeed in the commission of or evasion of apprehension for a second, different crime.

*Hamner*, supra, Transcript for September 23, 2022 Sentencing, pp. 20-21.

Judge Berman Jackson went on to apply the same guidelines that should apply to Mr. Sargent. Hamner Sentencing Transcript at 20-24.[2] Under the Obstructing or Impeding Officers guideline at § 2A2.4, Mr. Sargent receives a base offense level of 10 and a three-point enhancement for physical contact. USSG § 2A2.4. Because the adjusted offense level is less than 16, he receives a two-point decrease for acceptance of responsibility, resulting in a total offense level of 11. USSG § 3E1.1. Offense level 11 in Criminal History Category I yields an advisory range of 8-14 months.

The government notes that Judge Berman Jackson applied the aggravated assault guideline in *United States v. Leffingwell*, 21-cr-5. Government's Sentencing Memorandum at 23. However, Judge Berman Jackson explained clearly at the *Hamner* sentencing that the "most important"

---

[2] In her oral findings, Judge Berman Jackson switched the numbers for the aggravated assault and obstruction guidelines. It is clear from her analysis, however, and her reference to the advisory ranges that result from each guideline, that she found that the government did not meet is burden of showing that the aggravated assault guideline applies and instead applied the obstruction guideline.

distinction between Hamner and Leffingwell was that Leffingwell agreed that the aggravated assault guideline applied. *Hamner*, supra, Transcript at 15. When asked to actually confront the issue in the face of a dispute, Judge Berman Jackson determined that the aggravated assault guideline did not apply in *Hamner* for the exact reasons that should apply here.[3]

As one final example of the circularity of the argument to apply the aggravated assault guideline, the Court should consider that the probation department has determined both that the civil disorder qualifies as the other felony for the assault conviction, and that the assault qualifies as the other felony for the civil disorder conviction. PSR ¶¶ 41, 42 and n.4. The argument that each offense enhances the other reveals it as circular, that the enhancement is based on the same conduct as the convictions, and that, as Judge Berman Jackson, application of the aggravated assault guideline in these circumstances "strips the provision of any meaning." *Hamner*, supra, Transcript at 20.

**III.   <u>The sentencing factors of 18 U.S.C. § 3553(a) demonstrate that six months in federal prison is sufficient but not greater than necessary in this particular case</u>.**

A. <u>The nature and circumstances of the offense justify a slight downward variance because Mr. Sargent's criminal conduct was brief and he then left the area</u>.

Troy Sargent has admitted that he committed the offenses charged in this

---

[3] The defense is not aware of any case besides *Hamner* in which the parties disagreed about the proper guideline in similar circumstances.

case, the most serious of which are the civil disorder and the assault of an officer. The nature and circumstances of those offenses, however, are crucial in fashioning an appropriate sentence under the statute. 18 U.S.C. § 3553(a)(1).

The best evidence of the nature and circumstances of the offense are the videos submitted as the government's sentencing exhibits. These include videos taken by Mr. Sargent himself while at the Capitol and the police body camera footage that shows his two swings at an officer. In climbing a scaffolding, he engaged in criminally disruptive behavior. In choosing to come forward to the line of officers and swinging his open hand twice, he crossed a much more serious line that he acknowledges justifies a sentence that includes incarceration.

In mitigation, the nature of Mr. Sargent's conduct matters. He swung an open hand. That he did not make a fist during either swing matters because a fist is much more likely to cause injury than an open hand. Just as Mr. Sargent made a choice to swing at all, he also made a choice to swing his hand openly. This distinction matters under § 3553(a) because it is not considered under the guidelines. The guidelines treat an assault with an open hand the same as an assault with a fist.

The brevity of Mr. Sargent's conduct also matters. His two swings lasted less than a second each and were 30 seconds apart. Just as he chose to make those swings, he also chose to not make additional swings. At the moment he committed his offense, in the midst of an escalating riot in which hundreds of people pushed through barriers to enter the Capitol itself and remain on the

14

grounds for an extended period, Mr. Sargent chose to leave and go back to his hotel. Given the mob mentality clearly in effect, there is no explanation for this decision other than that Mr. Sargent realized he was wrong and he did not want to contribute to making the situation worse. Just was with the nature of his swings, the brevity also matters because it is not considered by the guidelines. Assaults committed over an extended period are treated the same as two momentary assaults committed within 30 seconds of each other. Where the guidelines do not meaningfully distinguish between cases, the Court must take account through the specific sentencing factors, including the nature and circumstances of the offense.

As explained above, the correct advisory guidelines range is 8-14 months. But that range would apply to longer assaults committed with a fist. Since Mr. Sargent committed two momentary open-handed assaults, the nature and circumstances of the offense justify the slight downward variance to six months incarceration recommended by the defense.


B. Mr. Sargent's history and characteristics justify a slight downward variance because his participation on January 6, 2021 was fueled by difficult personal circumstances that left him vulnerable to false information.

The truth of how Troy Sargent came to commit these offenses at the United States Capitol requires a basic understanding of difficult circumstances that he has faced throughout his life. Mr. Sargent's parents divorced when he was just two years old. PSR ¶ 74. After that he only saw his father on weekends. Id. Troy's relationship with his father was complicated by two significant factors-

his father's alcoholism and his father's loss of both his legs from a motorcycle accident when Troy was just five. Id. Although Troy remembers positive moments with his father, including breeding rabbits together, the challenges were obvious in the frequency and nature of their contact. Mr. Sargent's mother describes in her thoughtful letter to the Court how his father ceased all contact when Troy was just 13 years old. Exhibit A, Letter of Karen Sargent. She also writes of how she separated from Troy's father due to his drug, alcohol, and emotional abuse. Exhibit A, Letter of Karen Sargent at 2. Mr. Sargent's father died approximately two years later without any resolution to that loss. PSR ¶ 74.

Mr. Sargent's mother appears to have worked hard to support Mr. Sargent and his younger brother as a single mother. She encouraged his interests in outdoor activities such as fishing, camping, and hiking. PSR ¶ 76; Exhibit A, Letter of Karen Sargent. When his father stopped contact with him, his mother arranged for Troy to attend a summer camp that included similar activities at which Troy found a much-needed father figure. Exhibit A, Letter of Karen Sargent at 2. Sadly, although this mentor provided great support for teenage Troy Sargent, he left suddenly and ceased all contact, just as Troy's father had. Id. Ms. Sargent believes that "this separation led to distrust and a need for belonging and attention." Id.

The emotional challenges of Mr. Sargent's childhood expressed themselves in his behavior as he grew older. He was found in possession of marijuana at age 15. PSR ¶ 62. Although described by his family as very intelligent, he

dropped out of high school in the 12th grade. PSR ¶ 100. While that may have been an impulsive and poor decision, he showed resilience and discipline in obtaining his GED shortly after leaving school. PSR ¶ 100.

Mr. Sargent is skilled in carpentry and masonry, and his employment since high school has been in various forms of construction. PSR ¶¶ 101-111. That type of employment is strongly dependent on the local economy. The area around his home in Pittsfield, in western Massachusetts near the Vermont border, is primarily rural and does not provide the same economic opportunities as more populated areas in the state. As a result, although Mr. Sargent is described by everyone in his family as a hard worker, his employment has not been entirely consistent. For example, he worked at the same company for five years from 2012 to 2017, but left when it became clear the company was failing. PSR ¶ 110. He was unemployed at the time of his arrest in March 2021, PSR ¶ 103, but did find work painting houses and cutting trees for periods during the pendency of this case. PSR ¶¶ 105-106. His economic circumstances are tenuous, as he is receiving rental assistance as part of a program designed to help families who are at risk of becoming homeless. PSR ¶ 104, n.10.

Mr. Sargent's childhood circumstances also led to an adulthood of substance abuse. He used marijuana daily from the time he was 14-years-old until he was arrested in March 2021 at age 37. PSR ¶ 92. This progressed to a much more serious addiction for two years in his mid-twenties when he used heroin daily. Id. With hard work, he successfully ended his heroin addiction by

participating in a Methadone program. Id.

As the Court knows from hearings during the pendency of the case, Mr. Sargent used cocaine multiple times in violation of his conditions of release. PSR ¶ 93. He attended various treatment programs to address his use and had periods of sobriety. PSR ¶¶ 93-97. Mr. Sargent has acknowledged that he uses illicit substances to "escape." PSR ¶ 93. Ultimately his use of cocaine led to the Court revoking his release and ordering him into custody in October 2022. ECF # 63. However, it is important to note that despite his use of cocaine, Mr. Sargent discontinued his daily use of marijuana completely after his arrest. He also never relapsed on heroin, which was certainly a risk given the stressful circumstances of the pendency of this case.

Mr. Sargent's difficulty in his teenage years may also have played a part in him fathering a child when he was only 20 years old. PSR ¶ 80. Without a high school degree, suffering from substance abuse, and working relatively low paying work, it is not surprising that his relationship with the mother of his oldest son was tumultuous. Exhibit A, Letter of Karen Sargent at 2. His current girlfriend, the mother of his one-year-old son, noted in her letter that Mr. Sargent's approach to being a father now is informed by regrets of not being as present for his older son as he should have been. Exhibit A, Letter of Kerissa Hillard at 1.

Certainly, for all these reasons, Troy Sargent had lived a life that did not produce the stability and emotional connections that we all strive for. His mother, who has been close for Mr. Sargent's entire life, has written of the

circumstances that left Mr. Sargent vulnerable to the false information that motivated his presence at the Capitol on January 6, 2021. Due to not being able to afford basic cable (the only means of reliable television reception in many rural areas), Mr. Sargent began watching Youtube videos for entertainment. Exhibit A, Letter of Karen Sargent at 2. His interest in science led him to questionable videos about chemtrails and false claims that humans intentionally manipulated the weather. Id. As the Court may know, Youtube and similar platforms have programs that suggest similar videos, resulting in the reinforcement of false information. Id. Many of these videos are created to evoke negative emotions such as fear and outrage. A common response by viewers of these types of videos is to try to "help" others by sharing the videos with family and the public, something Mr. Sargent did. Exhibit A, Letter of Karen Sargent at 3. Eventually, many people can become trapped both in rabbit holes and echo chambers where false information is never challenged but instead is reinforced by creators and advertisers motivated by personal gain.

The false information that motivated Troy Sargent's presence at the Capitol is not simply a matter of his personal failures. Rather, the source of his information- Youtube, Facebook and social media in general- exposes him to false information more frequently. A Pew Research Center report published in July 2020 showed that people who relied primarily on social media for news knew less factual information about significant world events, including the 2020 election.  "Americans Who Get News Mainly on Social Media Are Less

Knowledgeable and Less Engaged," Pew Research Center, November 16, 2020, at https://www.pewtrusts.org/en/trust/archive/fall-2020/americans-who-get-news-mainly-on-social-media-are-less-knowledgeable-and-less-engaged. People who depend on social media are also more likely to be exposed to false news. Id. However, even though reliance on social media indicates a higher risk of being exposed to misinformation, one psychology professor has noted that "We are all susceptible." "Anyone can fall for 'fake news,' conspiracy theories: The psychology of misinformation," USA Today, January 14, 2021, available at https://www.usatoday.com/story/life/health-wellness/2021/01/14/capitol-violence-fake-news-psychology-conspiracy-theories/6636395002/. Psychology professor Dolores Albarracin from the University of Illinois at Urbana-Champaign explained how everyone is susceptible- "Because we cannot physically verify many of our beliefs – is the Earth round? – we need to trust sources and documentation. If we trust trustworthy sources, we are generally safe, although all sources are fallible. If we trust unworthy ones, we are in danger." Id.

Troy Sargent does not blame anyone for his conduct besides himself. An understanding of the progression that led to his offense, however, is certainly important in determining a fair sentence, particularly in light of the clear changes Mr. Sargent has made since January 6, 2021.

Four family members have written letters of support for Mr. Sargent- his mother, brother, son, and girlfriend, who is the mother of their one-year-old son. Exhibit A. Each one describes the same change they have seen in Mr.

Sargent since January 6, 2021. In describing the challenges of his childhood
and young adulthood, his mother writes that Mr. Sargent "put on a mask of
hardness and machismo which he wore until just after the events of January
6th, 2021." Exhibit A, Letter of Karen Sargent at 2. Since that date, however, he
no longer tries to 'educate' people on his beliefs and is much more respectful of
differing viewpoints. Id at 3. He told his girlfriend that he regrets his
involvement and that he never wants to go back to the District of Columbia.
Exhibit A, Letter of Kerissa Hillard at 2. His brother describes how Mr. Sargent
was shaken up by the events of January 6th, that he has expressed remorse,
and "reflected on his life and made some serious changes." Exhibit A, Letter of
Paul Sargent. Mr. Sargent's son has noticed that he is much more quiet and
doesn't share beliefs that he used to express passionately.  Exhibit A, Letter of
Troy Sargent Jr. This clear change in behavior demonstrates his remorse. Id.

   The fact that all of Mr. Sargent's closest family members have observed the
same significant changes is not a coincidence. Rather, it is proof that Mr.
Sargent has indeed changed since he committed his crimes in this case. The
primary factor for this change was the negative experience of January 6th itself.
Mr. Sargent even has difficulty watching the videos of himself because of the
degree of shame he feels. PSR ¶ 33. The government points to
exaggerated,boastful comments Mr. Sargent made to like-minded individuals
on social media in the days after January 6th. PSR ¶ 29; Government
Sentencing Memorandum at 15, 17, 29. It appears that the comments in those
particular forums made shortly after January 6th were still motivated by a

misguided attempt to find the belonging his mother knows he seeks. Mr. Sargent clearly was not immediately ready to take off the "mask of hardness and machismo" in front of everyone. Exhibit A, Letter of Karen Sargent at 2. Those social media comments to particular individuals are relevant, but should carry less weight than the long-term change he has displayed for nearly two years.

Despite having made those changes, Troy Sargent knows that consequences for his actions nearly two years ago will be imposed now.  Yet rehabilitation is relevant to the Court's determination of a sufficient, but not greater than necessary sentence. The Supreme Court has found that rehabilitation is an appropriate factor at a resentencing. "A district court at resentencing may consider evidence of the defendant's postsentencing rehabilitation and that such evidence may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range." *Pepper v. United States*, 562 U.S. 476, 481 (2011). In *Pepper*, the Supreme Court determined that the federal sentencing scheme made it necessary to consider evidence of the defendant's postsentencing rehabilitation for two main reasons. First, in order to fashion a sentence that is appropriate for an individual, and not just a crime, sentencing judges have traditionally considered the full range of available information. "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper* at 488, quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984).

Second, evidence of post-sentencing rehabilitation is necessary because it is relevant to many of the sentencing factors under 18 U.S.C. § 3553(a). *Pepper* at 491-492. In short, evidence of postsentencing rehabilitation "bears directly on the District Court's overarching duty to 'impose a sentence that is sufficient, but not greater than necessary' to serve the purposes of sentencing.'" *Pepper* at 493, quoting 18 U.S.C. § 3553(a). Logic dictates that rehabilitation achieved during the pendency of a case is just as important a factor at the original sentencing as post-sentencing rehabilitation at a re-sentencing.

The rehabilitation achieved by Troy Sargent is explained clearly in the letters from his family. He has become a better father, son, brother, and partner. He has let go of the animus that carried him to the Capitol on January 6th and become more tolerant of others. Those changes matter because they demonstrate true acceptance of responsibility. Actions speak louder than words. A defendant who has made relevant changes to his behavior warrants a shorter sentence than a defendant who has not even though the advisory range is the same. The changes Troy Sargent has made are another justification for a slight downward variance from the advisory range.

The person Troy Sargent has become is also relevant in another way- his great value to his family means that his absence will be even more painful, particularly for his one-year-old son. PSR ¶ 78; See also Exhibit B, Family Photographs. Mr. Sargent has been the boy's primary caretaker since his birth while the child's mother has been the primary earner. PSR ¶¶ 79, 81. Certainly the child has already felt the loss of Mr. Sargent due to his incarceration. Yet

23

the 27 month sentence recommended by the government would cause undue harm. Experts have noted the profound effects on children of losing a parent to jail: "Associated sociological and criminological theories point to three prominent ways in which the effects of parental imprisonment on the social capital of children might be understood.  These involve the strains of economic deprivation, the loss of parental socialization through role modeling, support, and supervision, and the stigma and shame of societal labeling."  John Hagan and Ronit Dinovitzer, "Collateral Consequences of Imprisonment for Children, Communities, and Prisoners" Crime and Justice, vol.  26  (1999), 121-162, 123. "The financial difficulties and loss of a parent precipitate a range of emotional and psychological problems that affect these children, including educational failures, aggression, depression, and withdrawal." Id. at 137-138. Government-sponsored studies have for many years recognized the need for alternatives to incarceration that minimize the damage suffered by children, reduce recidivism, and increase family preservation. Ross D. Parke & K. Alison Clarke-Stewart, Effects of Parental Incarceration on Young Children (Dec. 2001) (commissioned by U.S. Dept. of Health and Human Services as part of its From Prison to Home: The Effect of Incarceration on Children, Families and Communities project); Child Welfare League of America, Parents in Prison: Children in Crisis (1997).

Troy Sargent has become a better father than his own was, and even better than he himself was to his first son. The importance of Mr. Sargent to

his young son, and the harm extended incarceration will cause, are additional justifications for a slight downward variance.

C. <u>A sentence of 27 months, as recommended by the government, would result in unwarranted sentencing disparity</u>.

Every case is unique, but a comparison to similarly situated defendants is an important consideration in accordance with the statutory requirement to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a)(6). Compared to three defendants also convicted of assaulting officers, the government's recommended sentence of 27 months for Troy Sargent would violate this prohibition.

The government relies on *United States v. Kevin Douglas Creek*, 21-cr-00645-DLF, in which Judge Friedrich sentenced the defendant to a term of 27 months. Government Sentencing Memorandum at 33. Even the government's own recitation of the facts of *Creek* show that the defendant there committed a much more serious assault and so is deserving of a longer sentence. Creek was part of the crowd that surged against the police line and broke it. Id. Mr. Sargent was not. After breaking the line, Creek struck one officer in the face and shield with his bare hands. Id. He shoved and kicked a second officer and then threw a ratchet strap at the officer. Id. Mr. Sargent, as described above, assaulted one officer by making glancing contact with his finger after swinging his open hand. Even the government acknowledged the obvious- that Creek's assault was more serious. Id.

Moreover, while Mr. Sargent left the area without trying to get into the building, Creek attempted to but went to the wrong door. *Creek*, supra at ECF

# 48, Government's Sentencing Memorandum at 19. Creek also brought a knife with him. Id. There is no evidence that Mr. Sargent had a weapon of any kind. Indeed, the lack of reference to any kind of weapon in any of Mr. Sargent's own recordings and statements about the incident are strong indication that he did not possess one. Because he committed a much less serious assault, did not attempt to enter the Capitol building, and did not possess a weapon, Troy Sargent deserves a much shorter sentence than the one imposed on Kevin Douglas Creek.

Troy Sargent should also receive a fraction of the 30-month imposed on Thomas Patrick Hamner, the defendant in Judge Berman Jackson's case discussed above. Even though Judge Berman Jackson applied the lower obstruction guideline as discussed above, Hamner had a much more serious criminal history than Mr. Sargent that placed him in Criminal History Category V. *Hamner*, supra, Transcript at 22-23. Hamner thus faced the same advisory range that the government advocates here for Mr. Sargent- 24 to 30 months. Id at 23. Yet Hamner's conduct was much more serious than Mr. Sargent's. At sentencing, Judge Berman Jackson found that  Hamner "suited up in his helmet and he took multiple enthusiastic and entirely unlawful steps" to breach the barriers. *Hamner*, supra, Transcript at 44. Hamner also lifted a heavy, huge sign on wheels toward the line of officers. Id at 46. He hopped over barricades and tore down fencing. Id at 47. He wrestled bike rack barriers out of officers' hands. Id. For all that, for a person in Criminal History Category V, Judge Berman Jackson imposed a 30-month sentence. In comparison, six

months for Troy Sargent, in light of his much less serious criminal history and much less serious conduct, is entirely justified.

A third comparison to Troy Sargent's case can be found at *United States v. Mark Leffingwell*, 21-cr-005-ABJ. Mr. Leffingwell pled guilty to Assaulting, Resisting, or Impeding a Federal Officer under 18 U.S.C. § 111(a)(1) pursuant to a plea agreement. *Leffingwell*, at ECF # 25. The plea agreement included an agreement that the aggravated assault guideline applied. Id at 2. The parties agreed that Mr. Leffingwell faced the same advisory range as the government advocates for Mr. Sargent- 24 to 30 months. Id at 3. As described in the government's sentencing memorandum in that case, Leffingwell entered the Capitol building and found himself face to face with a regrouped line of officers. *Leffingwell*, ECF # 31 at 7. Leffingwell then chanted at the officers. Id at 8. When the officers pressed on the crowd to back them out of the doors, Leffingwell punched one officer in the head, then punched another officer in the head, and the punched the first officer again. Id.

Judge Berman Jackson sentenced Leffingwell to the sentence requested by the defendant here- six months incarceration and two years supervised release. *Leffingwell*, ECF # 51. Mr. Sargent should receive no more than Leffingwell because his conduct was clearly much less serious- he stayed outside of the Capitol building and swung an open hand at one officer. Leffingwell entered the Capitol and punched two officers in the head, one of them twice. It would be a clear unwarranted sentencing disparity in violation of the statute for Mr. Sargent to receive a longer sentence than Leffingwell.

**IV.** **Mr. Sargent cannot be lawfully ordered to pay restitution based on the facts of this case.**

The government seeks an order of $2,000.00 restitution against Mr. Sargent. Government Sentencing Memorandum at 34. However, such an order cannot be imposed in this case for several reasons.

First, the two statutes that the government relies on for a restitution order both only authorize restitution orders to a "person." 18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2). The government is not a "person" and so the plain language of the statute does not authorize restitution to the government. But See *United States v. Ekanem*, 383 F.3d 40, 44 (2nd Cir. 2004) (holding that the government qualifies as a victim under for purposes of 18 U.S.C. § 3663A).

Second, the facts of the offense clearly show that Mr. Sargent did not cause any property damage. His contact with the visor of the officer was so minor that it did not cause damage. Nor did he even attempt to enter the Capitol building. Nor did he encourage anyone else to enter the Capitol or damage any property. Without any evidence of damage caused by Mr. Sargent, this Court lacks a basis to order him to pay restitution.

Finally, as to 18 U.S.C. § 3663, in determining restitution the Court "shall consider...the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the Court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i)(II). As shown in the Presentence Report, Mr. Sargent has a negative net worth.

28

PSR ¶113. He also has a one-year-old son and a girlfriend who works at Burger King. PSR ¶ 78. Mr. Sargent clearly does not have the means to pay restitution, which is a required consideration under the statute.

**V. <u>Conclusion</u>**

Troy Sargent has clearly acknowledged the harm he caused, both to the Court and to his family. He has truly accepted responsibility by making significant changes in his behavior. Where the correct advisory range recommends a sentence of 8 to 14 months, a slight downward variance to six months incarceration and two years of supervised release is fully supported by the sentencing factors of 18 U.S.C. § 3553(a), specifically the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities.

Although he has been charged with offenses in the past, every one occurred more than eight years ago. PSR ¶¶ 59-70. None score criminal history points. Id. None resulted in any period of incarceration. Id.  Six months in federal prison as a first incarceration will certainly accomplish the goals of sentencing for Troy Sargent. He has not in any way become numb to the separation from his family and deprivation of liberty. His incarceration will be keenly felt as punishment and deterrence.

 Under all the facts and circumstances of this case, a sentence of six months incarceration and two years supervised release is one that is sufficient, but not greater than necessary.

Respectfully Submitted,
TROY SARGENT
By his attorney,

*/s/ Joshua R. Hanye*
Joshua R. Hanye
MA B.B.O. No. 661686
Joshua_Hanye@fd.org
Federal Defender Office
51 Sleeper Street
Boston, MA  02210
Tel: 617-223-8061

## Certificate of Service

I hereby certify that this document was sent electronically to those registered through ECF on December 6, 2022.

*/s/ Joshua R. Hanye*
Joshua R. Hanye